Louisville & Nashville R. R. Co. v. Eakin's Adm'r.

CASE 66—PETITION ORDINARY—APRIL 27.

# Louisville & Nashville R. R. Co. v. Eakin's Adm'r.

APPEAL FROM HENDERSON CIRCUIT COURT.

1. PEREMPTORY INSTRUCTION.—If the facts are in dispute, or if different conclusions might fairly be reached by different minds from the facts established, the case should not be taken from the jury.

2. RAILROADS—STOPPING TRAIN AT STATION—DUTY OF COMPANY.—A train must stop long enough at stations to afford passengers reasonable time to alight therefrom, with safety after its arrival; the passengers owe the corresponding duty to get off without unnecessary delay; but it is not the duty of railroad officials to hold the train long enough at the station to enable passengers to leave the train and reach the station platform with ease and safety.

3. INSTRUCTION.—In an action by the administrator of a decedent against a railroad company to recover for his death by reason of the defendant's negligence, an instruction directing the jury to find for the plaintiff the damages sustained by the widow and children was erroneous and was calculated to divert the attention of the jury from the duty of fixing the sum which would fairly compensate the estate for the destruction of the decedent's power to earn money, and direct it to the affliction which had overtaken the family by reason of his death.

4. EVIDENCE.—In such an action evidence as to the number and condition of the family left by the decedent is incompetent.

5. MEASURE OF DAMAGES.—The measure of damages in such an action is such a sum as will reasonably compensate his estate for the destruction of his power to earn money, and in arriving at this amount, the jury is authorized to consider all the testimony bearing on this question.

YEAMAN & LOCKETT FOR APPELLANT.

(Brief not in Record.)

[ 30 ]

JOHN L. DORSEY, W. P. McCLAIN & MONTGOMERY MERRITT
  FOR APPELLEE.

1. Whether alighting from a moving train constitutes negligence or
   not is a fact to be determined by the jury. Passamaneck's Admr.
   v. L. & N. R. R. Co., 17 Ky. Law Rep., 767; 74 Iowa, 732; L. & N.
   R. R. Co. v. Bird's Admr., 17 Ky. Law Rep., 1110; Redfield on
   Railways, 2 vol., page 231; 91 Ky., 49.

2. Measure of damages is the power of the deceased to earn money,
   and the evidence as to the amount he did earn was competent,
   and the jury were properly authorized to consider the age and
   probable duration of life. L. & N. R. R. Co. v. Berg's Admr.,
   96 Ky., 610; C. & O. R. R. Co. v. Lang's Admr., 100 Ky., 221.

3. It was proper to offer in evidence that the decedent left a widow
   and two children, the question being controlled by the instruction
   of the court. Railroad Company v. Kuhn, 86 Ky., 590; Railroad
   Company v. Mahoney's Admr., 7 Bush, 238.

4. The fact that the jury was told they must find the damages that
   the widow and children sustained, could not prejudice the appel-
   lant, for the statute provides that the damages shall be for their
   benefit.

5. The damages are not excessive; the new Constitution, sec. 54, pro-
   vides that the general assembly shall have no power to limit the
   amount of recovery for injuries resulting in death, or for injuries
   to person, or property, and the court should follow the spirit of
   that instrument.

WALKER D. HINES FOR APPELLANT, IN PETITION FOR MODIFICATION
  OF OPINION.

1. The plaintiff wholly failed to adduce any evidence to sustain the
   real cause of action sought to be set up in the pleadings, that is,
   that Eakins, while in the act of leaving the train, was thrown
   from it by its being suddenly and violently started. Cin., &c. R.
   Co. v. Dufrain, 36 Ill. App., 352.

2. The only act of negligence which could possibly be imputed to
   the railroad company under this record, even disregarding the
   physical facts which are wholly inconsistent therewith, is the
   alleged insufficient stop of the train, and that could not, in the
   nature of things, have been the direct, or the immediate, or the
   natural, or the probable cause of the accident. Shields v. L. & N.
   R. R. Co., 16 Ky. Law Rep., 849; Smith v. West. Union Tel. Co.,

Louisville & Nashville R. R. Co. v. Eakin's Adm'r.

83 Ky., 104; C., St. P., M. & O. R'y. Co. v. Elliott, 55 Fed. Rep., 949; Lewis v. F. & P. M. R'y. Co., 54 Mich., 55; 18 A. & E. R. R. Cases, 263; Warren v. R'y. Co., 37 Kan., 408; 15 Pac. Rep., 601; Houston, &c. R. R. Co. v. Leslie, 57 Tex., 83; 9 A. & E. R. R. Cases, 407; Cent., &c. R. R. Co. v. Letcher, 69 Ala., 106.

3. Eakins' act in voluntarily leaving the train after it had started was presumptively a negligent act, and there are no circumstances in this record to rebut that presumption or relieve him from the consequences of his own action. Morel v. Miss. Valley Life Ins. Co., 4 Bush, 535; L. & N. R. R. Co. v. Sickings, 5 Bush, 1; Favre v. L. & N. R. R. Co., 91 Ky., 541; Clark's Admr. v. L. & N. R. R. Co., 18 Ky. Law Rep., 1082; Shelton, Admr., v. L. & N. R. R. Co., 19 Ky. Law Rep., 215; Adams' Admr. v. L. & N. R. R. Co., 82 Ky., 603; Durham v. L. & N. R. R. Co., 16 Ky. Law Rep., 757; Belt Electric Line Co. v. Tomlin, 19 Ky. Law Rep., 433; Watson v. G. P. R. R. Co., 81 Ga., 476; 7 S. E. R., 854; S. F. & W. R. R. Co. v. Watts, 82 Ga., 229; 9 S. E. R., 129; Jarrett v. A. & W. R. R. Co., 83 Ga., 347; 9 S. E. R., 681; Wheland v. Ga., &c., R. R. Co., 84 Ga., 506; 10 S. E. R., 1091; Patterson v. C., &c., R. R. Co., 85 Ga., 653; 11 S. E. R., 872; Barnett v. E. T., V. & Ga. R'y. Co., 87 Ga., 766; 13 S. E. R., 904; A., &c. R. R. Co. v. Dickinson, 89 Ga., 455; 15 S. E. R., 534; E. T., V. & G. R'y. Co. v. Hughes, 92 Ga., 388; 17 S. E. R., 949; Jones v. Ga., &c. R. R. Co., — Ga., —; 29 S. E. R., 927; Cent., &c. R. R. Co. v. Letcher, 69 Ala., 106; Ricketts v. Birm. St. R'y. Co., 85 Ala., 600; McDonald v. Mont. St. R'y. Co., 110 Ala., 161; 20 S. R., 317; L. & N. R. R. Co. v. Lee, 97 Ala., 325; 12 S. R., 48; E. T., V. & G. R'y. Co. v. Holmes, 97 Ala., 332; 12 S. R., 296; C. R. & B. Co. v. Miles, 88 Ala., 256; M. & E. R'y. Co. v. Stewart, 91 Ala., 421; 8 S. R., 708; Toledo, &c. R. R. Co. v. Wingate, 37 N. E. R., 274; s. c. 143 Ind, 125; 42 N. E. R., 477; Reibel v. R. R. Co., 114 Ind., 476; 17 N. E. R., 107; N. Y., L. E. & W. R. R. Co. v. Enches, 127 Pa. St., 316; 17 A. R., 991; Reddington v. Pa. Traction Co., 132 Pa. St., 154; 19 A. R., 28; Leggett v. West., &c. R. R. Co., 143 Pa. St., 39; 21 A. R., 966; Bacon v. Railroad Co., 143 Pa. St., 14; 21 A. R., 1002; O'Toole v. Pittsburg, &c. R. R. Co., 158 Pa. St., 99; 27 A. R., 737; Victor v. Pa. R. Co., 164 Pa. St., 195; Rothstein v. Pa. R. R. Co., 171 Pa. St., 620; Walker v. Railroad Co., 41 La. Ann., 695; 6 S. R., 916; Odum v. St. L., &c. R. R. Co., 45 La. Ann., 1201, 14 S. R., 734; Railroad Co. v. Morris, 31 Grat., 200; R. & D. R. R. Co. v. Pickleseimer, 85 Va., 798; 10 S. E. R., 44; Burrows v.

Louisville & Nashville R. R. Co. v. Eakin's Adm'r.

Erie R'y. Co., 63 N. Y., 556; Solomon v. Railroad Co., 103 N. Y., 437; 27 A. A. R. Cases, 155; McMurtry v. L., N. O. & T. Ry. Co., 67 Miss., 601; 7 S. R., 401; Worthington v. Cent. Vt. R. R. Co., 64 Vt., 107; 23 A. R., 590; Burgin v. R. & D. R. R. Co., 115 N. C., 673, 20 S. E. R., 473; Butler v. St. P. & D. R. R. Co., 59 Minn., 135; 60 N. W. Rep., 1090; Gavett v. Railroad Co., 16 Gray, 501; Merritt v. N. Y., N. H. & H. R. R. Co., 162 Mass., 326; Railroad Co. v. Massengill, 15 Lea, 328; Railroad Co. v Stacker, 86 Tenn., 343; N. Y. P., &c. R. R. Co. v. Colburn, 69 Md., 360; 16 A. R., 208; Balt. Traction Co. v. States, 78 Md., 409; 28 A. R., 297; McDonald v. B. & M. R. R. Co., 87 Me., 466; Brown v. C., &c. R. R. Co., 80 Wis., 162; 49 N. W. R., 807; Secor v. Railroad Co., 10 Fed. Rep., 15; L. N. A. & C. R. R. Co. v. Johnson, 44 Ill. App., 56; Mo. Pac. R'y. Co. v. T. & P. R'y. Co., 36 Fed. Rep., 879; Jeffersonville R. R. Co. v. Hendricks' Admr., 41 Ind., 48.

H. W. BRUCE, YEAMAN & LOCKETT AND E. W. HINES OF COUNSEL FOR APPELLANT.

JUDGE BURNAM DELIVERED THE OPINION OF THE COURT.

Appellee alleged in his petition that in January, 1895, his intestate was a passenger on appellant's train from the city of Henderson to Robards' Station, a regular station and stopping place for receiving and discharging passengers; that when the train reached the station it did not stop long enough to enable his intestate to get off, and that while endeavoring to alight from the train those in charge of, with gross and willful negligence, put the train in motion and threw decedent under the wheels thereof, and that the train ran over him injuring him so severely that he died about four hours after receiving the injury.

The answer denies the negligence charged, and pleads that the train was stopped at the station long enough for appellee's intestate to leave it with safety, but that he did not avail himself of the stop but waited until the train was in such motion that he could not safely alight, and then

negligently attempted to get off, whereby he received the injury complained of, and that but for his negligence in getting off the train while it was in motion he would not have been killed.

The first trial resulted in a verdict and judgment for plaintiff, which was set aside by the lower court, to which ruling appellee excepted, prayed an appeal and prepared a bill of exceptions. A new trial was granted, which resulted in the verdict and judgment appealed from. A motion for still another trial, based on numerous grounds, having been overruled, the case and judgment are brought by a bill of exceptions to this court for review.

Appellee made no motion to substitute the first verdict for the second, and the order setting aside the first verdict and granting a new trial is not before this court.

The chief ground relied on for reversal is that the court erred in giving instructions Nos. 1, 2, 3 and 4, but chiefly in refusing to give a peremptory instruction asked by appellant; in permitting appellee to prove that decedent was a married man and left three children, one of whom was born since his death, and in admitting evidence to the effect that one Royster attempted to alight from the train at Robards' Station but failed to do so.

The testimony shows that decedent was a young man in fine health, about twenty-nine years of age, a farmer by occupation, and of ordinary intelligence; that before the train arrived at the station it was announced by the officials in charge thereof; that it consisted of a baggage-car, a smoker, a ladies' car and a sleeping-car; that decedent occupied a seat in the ladies' car next to the sleeper,

which was the rear car; that the platform of the station was only about sixty feet long, and that when the train came to a halt, the front end of the ladies' car was along side the station platform and the rear end was in the middle of the street; that ten passengers were due to alight from the train at this station and that seven of them alighted on the station platform between the ladies' car and the smoker, the conductor and porter being between these cars on the platform assisting them to alight, some of the passengers coming out of the ladies' car and some out of the smoker; and that decedent and one other passenger, McMullin, went out the rear door of the ladies' car.

There is considerable diversity in the statements of witnesses as to the exact location of decedent at the time the train started, some of them testifying that when he came out of the coach onto the platform the train was stationary, and that as he was going down the steps it moved off; that the train was coupled together with automatic couplers, and that the whole train moved at once without any jerking, there being little or no slack; while other witnesses testify that the train started before decedent had gotten out of the car onto the car platform; that it had moved about fifty feet on a down grade and had attained a speed of about five miles an hour at the time he attempted to alight; that the rear end of the car had been drawn up so that it was alongside the station platform, and that while he was on the steps of the car he looked around and seemed to hesitate about attempting to alight. And these statements are corroborated by the testimony of appellee, that decedent told him before his death that some one said that he "could make it."

There is also diversity in the statements of witnesses as to the promptness with which decedent got ready to leave the car, after the announcement of the station, a number of them testifying that he did so promptly; while another witness, who seems to have had special opportunities for observing him, testifies that decedent occupied an inverted seat opposite to him; that he seemed "easy about getting out," and kept his seat about half a minute after the train stopped; that he appeared slow in his movements, and that he told him to hurry up.

The conductor testifies that before giving the signal to start the train he looked down the aisle of the ladies' car, and saw no one in the aisle, and supposed that all had safely alighted, before he gave the signal to start, corroborating the testimony of witnesses that decedent had left the coach and was on the car platform at this time.

It may be fairly deduced from all the testimony that the train was in motion at the time decedent attempted to get off and fell under the wheels of the rear car and that he did so without the knowledge of any of appellant's agents in charge of the train.

It is contended for appellant that the attempt of decedent to alight from the train, while it was in motion, was per se negligence; that appellant can not be held responsible for the injury resulting therefrom, and that the motion for a peremptory instruction should have prevailed.

There is considerable authority to support this contention, but it seems to us that under the testimony the question as to whether the attempt on the part of decedent to alight (under all the circumstances surrounding the act)

was negligence, was properly submitted to the jury. It was the duty of appellant to stop its train at the station a sufficient length of time to enable passengers to alight therefrom with safety, and it was the reciprocal duty of those passengers who desired to get off to do so without unnecessary delay; and if appellant's servants in charge of this train disregarded their duty they were guilty of the first act of negligence, and the fact that decedent voluntarily attempted to alight, under the circumstances of this case, is not conclusive presumption of negligence on his part.

"As a rule it may be said that where a passenger, by the wrongful act of the company, is compelled to choose between leaving the cars while they are moving slowly, or submitting to the inconvenience of being carried by the station where they desire to stop, the company is liable for the consequences of the choice, provided it is not exercised negligently or unreasonably." (See Wood on Railroads, vol. 2, p. 1299.)

"It can not be said, as a matter of law, independently of the statute, that it would be under all circumstances an act of negligence for a passenger to attempt to alight from a moving train. But the question is ordinarily one of fact, to be determined by the jury from all the circumstances of the transaction. It is true a case might arise in which it would be the duty of the court to determine the question as matter of law. This would be true if there were no disputed facts, and but one conclusion could fairly be drawn from the facts established. But if these facts are in dispute, or if different conclusions might fairly be

reached by different minds from the facts established, the question is for the jury." (See Raben v. Central Iowa Ry. Co.., 74 Ind., 735, and Whitsett v. Chicago, R. I. & P. Ry. Co., 67 Iowa, 150.)

In passing upon the question of the submission to the jury of a question of negligence, in Railroad Company v. Stout, 17 Wall., 657, the United States Supreme Court, Mr. Justice Hunt delivering the opinion, said:

"It is true, in many cases, that where the facts are undisputed the effect of them is for the judgment of the court, and not for the decision of the jury. This is true in that class of cases where the existence of such facts come in question rather than where deductions or inferences are to be made from the facts. . . . If a sane man voluntarily throws himself in contact with a passing engine, there being nothing to counteract the effect of this action, it may be ruled as a matter of law that the injury to him resulted from his own fault and that no action can be sustained by him or his representatives. So if a coach-driver intentionally drives within a few inches of a precipice, and an accident happens, negligence may be ruled as a question of law. On the other hand, if he had placed a suitable distance between his c' ach and the precipice, but by the breaking of a rein or an axle, which could not have been anticipated, and an injury occurred, it might be ruled as a question of law that there was no negligence and no liability. But these are extreme cases. The range between them is almost infinite in variety and extent. It is in relation to these intermediate cases that the opposite rule prevails. Upon the facts proven in such cases, it is mat-

ter of judgment and discretion, of sound inference; what is the deduction to be drawn from the undisputed facts. . . . It is this class of cases and those akin to it that the law commits to the decision of a jury."

"Whether alighting from a moving train constitutes negligence or not is a fact to be determined by the jury trying the cause, taking into consideration all the circumstances in connection with the alighting." (See L. & N. R. R. Co. v. Crunk, 119 Ind., 549.)

In the case of the Evansville R. R. Co. v. Duncan, 28 Ind., 447, the court, in speaking of a person leaving a train while in motion, said:

"If the leap was made under such circumstances that a person of ordinary caution and care would not have apprehended danger therefrom, then it was not such an act of carelessness as would relieve the defendant from the responsibility otherwise resting upon it."

The testimony in the case is conflicting as to whether the train stopped at the station a sufficient length of time to enable the passengers to alight therefrom with safety, and also as to the promptness of decedent in leaving the train after it had stopped; and there is considerable diversity in the testimony as to decedent's exact location on the car when the train started, and as to the rate of speed it had attained at the time he attempted to alight.

All these facts must be considered in ascertaining whether decedent's effort to get off the train when he did so was negligence on his part, and necessarily required the intervention of a jury for the proper determination of their bearing upon the issue involved, and justified the

overruling of appellant's motion for a peremptory instruction.

We will now consider the instructions given by the court which were excepted to by appellant. By the first instruction the jury were told:

"When the train in question arrived at Robards' it was the duty of those in charge to hold it long enough to enable the plaintiff's intestate to have left the train and reached the station platform with ease and safety, the number of passengers leaving at that station being considered. If they did not hold it such length of time they are guilty of negligence, and if said Eakins was killed in attempting to leave the train (without negligence on his part as hereinafter defined) they will find for the plaintiff the damages sustained by the widow and children, not exceeding the amount sued for, $20,000."

There is no time fixed by law for a train to remain at a station. This necessarily depends on the number of passengers getting on and alighting therefrom and the amount of business to be transacted at that point, but a train must stop long enough at stations to afford passengers reasonable time to alight therefrom with safety after its arrival, and the passengers owe the corresponding duty to get off without unnecessary delay, as the prudent and careful operation of railway trains require that there should be promptness and regularity in their arrival and departure from stations, and dispatch is a necessary element in their proper management. It was no part of appellant's duty to hold its train until deceased could leave it with ease, and the addition of this word to the instruc-

tion was calculated to mislead the jury as to appellant's duty in affording decedent time to get off. The word is vague and indefinite, and the Superior Court of Kentucky, in L. & N. R. R. v. Abell, 14 Rep, 239, in passing upon an instruction where the jury were told that "it was the duty of appellant to stop its train long enough to allow the appellee to alight therefrom with safety and comfort said:

"The addition of the word 'comfort' to the instruction was unauthorized. To say that passengers must have time to leave railroad trains with comfort would make it incumbent on those in charge to inquire into the physical condition of each passenger. This has never been, and of course, could not be required. If the employes of the company are notified of the inability of a passenger to leave the train in the usual time, they are bound to give time which in his condition would be reasonable time to do so with safety. In all these cases, the question of what is reasonable time is a question of fact to be determined by the circumstances of each case, but as a general rule companies can only be required to afford reasonable time to passengers, whether young or old, to leave the cars with safety."

This instruction is objectionable also for another reason. It directed the jury to find for the plaintiff "the damages sustained by the widow and children, not exceeding the amount sued for." They were not parties to the action, and this part of the instruction, when considered in connection with the testimony which was permitted to go the jury over the objection of appellant,—that decedent was a married man and left three children,—it was extremely

In Sedgwick on the Measure of Damages, 7 Ed., vol. 1, note, it is said: "In an action by a woman against a railway company for damages for personal injuries, neither the death of her husband from the same cause, nor the fact that she has children dependent upon her for support, is admissible to increase damages."

In City of Chicago v. O'Brennan, 65 Ill., 163, the court said:

"Was this evidence admissible? If it was, then it would have been competent to have gone further and shown all the circumstances of the family, such as that the mother was an invalid; that one of the daughters was blind; that one son had accidentally lost a leg, etc., if such had been the case, so as to present a most pitiable picture of a helpless family dependent upon appellee for support as a lecturer. For, as the evidence had no place in the case, but as a stimulant to the jury, it would have been just as competent to make the stimulant strong as weak. But was it competent at all? It is an elementary rule that evidence must be confined to the points at issue. There was no point in issue to which this evidence had any relevancy. This sort of attempt to foist irrelevant matters upon the attention of the jury with a view to creating a personal interest is too often the secondary resort of a party on the witness stand."

And this rule has received the approval of this court in a number of recently decided cases. (See Standard Oil Co. v. Tierney, 92 Ky., 377; C. N. O. & T. P. Ry. Co. v. Sampson's Admr., 16 Ky. L. Rep.,819, and L. & N. R. R. Co. v. Kelley's Admr. 100 Ky. 421.

prejudicial, as it diverted the attention of the jury from the duty of fixing the actual sum of money which would fairly compensate the estate of decedent for the destruction of his power to earn money and directed it to the affliction which had overtaken the family by reason of his death.

"There is no rule of law under which the estate of a deceased father, of a dozen children can properly recover, on account of his death, more than the estate of such a father of one child or none.    The real question in the case is, what was the value of decedent's life to his estate, and the number of his children can have no legitimate bearing upon that question.    And the great weight of authority supports this view."    (See Beams v. Chicago R. R. Co., 26 Iowa, 363.)

And the principle laid down by the text writers on this question is stated in Patterson on Railroad Accident Law, 372 as follows:

"Proof of the number of a family dependent upon a person injured, or of his or their property, is not admissible for such testimony would obviously tend to prejudice the jury or divert their minds from the real issue in the case."

In Thompson on Negligence, vol. 2, 1263, the rule is thus stated:

"It is clearly inadmissible to introduce evidence of the number of persons dependent upon decedent for support."

In Rorer on Railways, vol. 2, 1009, it is said: "That a plaintiff in an action for an injury to his person inflicted by negligence should not be allowed to prove 'that others were dependent upon him for support.' "

The second instruction is also objectionable because it told the jury, substantially, that deceased could not have been negligent unless the train had been held long enough for him to leave it with ease and safety.

In the fifth instruction the court said: "If the jury find for the plaintiff, the measure of damages will be the capacity of deceased to earn money coupled with his expectation of life."

This instruction is in direct conflict with a number of recent adjudications of this court. Under it, all that it was necessary for the jury to do to arrive at a verdict was to determine how much deceased was capable of earning in a year and multiply that amount by his expectation of life. The true measure of damages is not the capacity of the deceased to earn money, but is such a sum as will reasonably compensate his estate for the destruction of his power to earn money, and in arriving at the amount of this sum the jury are authorized to consider all the testimony in the case bearing upon this question.

This question has been so thoroughly and carefully considered by this court in L. & N. R. R. Co. v. Graham's Admr., 17 Ky. L. R., 1232; L. & N. R. R. v. Kelley's Admr., 100 Ky. 421, and C. & O. Ry. v. Lang's Admr., 100 Ky. 221, that any further elaboration of this idea is unnecessary.

For the reason indicated the judgment is reversed and the cause remanded for proceedings consistent with this opinion.

JUDGE PAYNTER DELIVERED THE FOLLOWING DISSENTING OPINION:

There is no evidence in this case which tends to show that the decedent was killed by the train starting whilst he

was in the act of stepping from it, much less any evidence tending to show that appellant's employes advised him that he could alight therefrom with safety; neither is there any evidence which shows that those in charge of the train knew that he was attempting to alight from it, nor is it contended or shown that the starting of the train had placed the decedent in a perilous position which required him to elect whether it was best for his safety to remain on or jump from the moving train. The only conflict in the testimony is on the questions as to whether the train was stopped long enough at the station to enable passengers to alight therefrom with safety; and as to whether the decedent was sufficiently prompt in leaving the train after it had stopped; and as to the rate of speed the train had attained at the time he attempted to alight therefrom. All agree that the train had started on its journey and had attained considerable speed when the decedent attempted to alight therefrom. The testimony shows that the becedent was killed in alighting from the train whilst in motion, and on this point there is no conflict in the testimony. I will assume, for the purpose of considering the legal aspect of the case, that the train did not remain at the station long enough to enable the decedent to alight therefrom with safety:

It was the duty of those in charge of the train to have kept it at the station long enough to have allowed the decedent to alight from it in safety; and their failure to do so was a breach of its contract to carry the decedent to the station to which he had bought his ticket, as the contract allowed him time to alight from the train in safety. For

this violation of a duty the decedent had a remedy in an action against the railroad company for damages.

The wrongful act of the company was complete when the train was started, a liability for the wrong had attached. The decedent knew this fact; and that the train was moving from the station when he alighted from it. It is true that the decedent would have had no occasion for jumping from the moving train had he been allowed time to have alighted therefrom at the station, but this did not make the company liable for his voluntary and negligent act. Notwithstanding the wrongful act of the company, the injury could not have happened to him except for his own negligent act. If it could be said that the wrongful act of the railroad company, and that of the decedent, concurred to produce the injury, then, under a well-recognized principle, the railroad company is not liable for the injury. The acts did not concur in producing the injury. Neither was the act of the decedent in alighting from the moving train the direct and immediate consequence of the wrong of the company. Without the advice or knowledge of the employes in charge of the train the decedent exposed himself to the peril of the act of alighting from the moving train. The result shows that his act was perilous. One who inflicts an injury upon his own body must abide the consequences. Had the train started before giving the decedent time to alight in safety, and just as he was stepping therefrom, then the company would have been liable for damages, if he had been killed by the train; or if the train had started but had not attained a speed which made

[31]

it obviously hazardous to alight therefrom, and the employes of the train had advised him that he could alight with safety, then the company would have been liable for damages, if his death had resulted from thus alighting from the train. Again, had the decedent been placed in a perilous position by reason of the fact that sufficient time had not been given him to alight from the train, and he was forced to elect whether he would risk the hazard of remaining on the train or chance the peril of jumping from the moving train, the railroad company would have been liable for the consequences of the election thus forced by its wrong. No such circumstances as those exist in this case which I have described, therefore there was no question of negligence to be submitted to the jury.

It is said by Wood on Railroads, vol. 2, sec. 305:

"It appears to us that in view of the danger which necessarily attends such an act it would be held as a matter of law that it is negligence to attempt to board or to alight from a train while it is in motion, and the question should not be left to the jury unless there are exceptional circumstances tending to excuse or justify the act. And the great weight of authority favors this view. The failure of the company to stop its train at a station as it ought to do, or to stop it for a sufficiently long time, does not justify a passenger in leaving a moving train; his proper course is to be carried on until the train stops, and if he sustains pecuniary or other loss from being carried beyond his station his remedy lies in an action for damages."

It is said by Rorer on Railroads, vol. 2, chap. 52:

"So, if a passenger is being carried past a station to

which he is bound, and at which, by his ticket, and the rules of the road as to the running of the trains, he has a right to be let off, he may not, except at his own risk and peril, get off, or leap from the cars whilst they are moving. He can not, by such rashness, impose any liability upon the company for the consequence thereof. In such case it is his duty to remain on, and he may then have his redress in an action of damages for being carried past the station whereat he had a right to stop. He may, in such case, recover for the inconvenience, lost time, and increased labor and expense of travel, occasioned thereby, as also for all damage which is directly a result of the wrong act or negligence of the company.

"In like manner, if the stoppage be too short to allow passengers to leave the cars with convenience and safety, they may not, at the risk of the company, attempt to leave the cars whilst starting or in motion. If they do so, they do it at their own risk. They should remain aboard, and resort to their action for damages, occasioned by the negligent or wrong act·of the company in not affording a reasonable opportunity or time to leave the train."

These text writers cited numerous cases of courts of last resort of many of the States of the Union in support of the texts.

Judge Jeremiah S. Black in delivering the opinion of the court in Railroad Company v. Aspell, 23 Pa. State, 150, said:

"From these principles, it follows very clearly that if a passenger is negligently carried beyond the station where he intended to stop and where he had a right to be

let off, he can recover compensation for the inconvenience, the loss of time, and the labor of traveling back; because these are the direct consequences of the wrong done him. But if he is foolhardy enough to jump off without waiting for the train to stop, he does it at his own risk, because this is gross imprudence, for which he can blame nobody but himself. If there be any man who does not know that such leaps are extremely dangerous, especially when taken in the dark, his friends should see that he does not travel by railroad."

I dissent from the opinion of the court only in so far as it differs from the views I have expressed.

JUDGE GUFFY DELIVERED THE FOLLOWING DISSENTING OPINION:

I dissent from so much of the opinion in this case as holds that any portion of the earnings of deceased necessary for his own support should be deducted from the amount the jury should be allowed to assess as damages for the destruction of his power to earn money. The portion of the opinion from which I particularly desire to dissent reads as follows:

"In the fifth instruction the court said: 'If the jury find for the plaintiff, the measure of damages will be the capacity of deceased to earn money, coupled with his expectation of life.' This instruction is in direct conflict with a number of recent adjudications of this court. Under it, all that was necessary for the jury to do to arrive at a verdict was to determine how much deceased was capable of earning in a year, and multiply that amount by his expectation of life. This entirely leaves out of view the fact that deceased necessarily applied a certain proportion of

the money earned by him to his own support.  The true measure of damages is not the capacity of the deceased to earn money, but is such a sum as will reasonably compensate his estate for the destruction of his power to earn money; and, in arriving at the amount of this sum, the jury are authorized to consider all the testimony in the case bearing upon this question.  This question has been so thoroughly and carefully considered by this court in Railroad Co. v. Graham's Admr., 34 S. W., 229; Railroad Co. v. Kelley's Admx., 100 Ky. 421, and Railway Co. v. Lang's Admr., 100 Ky. 221, that any further elaboration of this idea is unnecessary."

It seems to me that the rule announced in the opinion *supra* is in conflict with section 241 of the Constitution, which reads as follows:

"Whenever the death of a person shall result from an injury inflicted by negligence, or wrongful act, then in every such case damages may be recovered for such death from corporations and persons so causing the same.  .  ."

And also in conflict with the spirit of section 54 of the Constitution, which reads as follows:

"The General Assembly shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property."

The rule announced in the majority opinion in this case would always prevent the recovery for any damages where the power of the decedent to earn money was not greater than the amount necessary to defray his expenses of living; or in other words to furnish him with food, raiment and shelter, and pay his taxes; and would certainly defeat

the recovery in all cases where the decedent was not able, or his capacity was not sufficient to earn more money than was necessary to furnish him with food, raiment and shelter. Such a rule would, in a large number of cases, defeat any recovery for damages for the killing of a wife, because the capacity of the wife to earn money in excess of what it would cost to furnish her with food, raiment and shelter could not be shown for the reason it would not in fact exist; and the same may be said in regard to the killing of infants, for after deducting the cost of their necessary nurture and their support after maturity their power to earn money would rarely exceed the expenses aforesaid.

Can it be that the organic law of the land intended that the husband should recover of the party causing the death of his wife only so much money as she was able to earn over and above what it was necessary to support her? Or can it be said that such a rule should be applied to the destruction of the life of an infant?

Under the rule announced in the majority opinion, it is manifest that no recovery could be had for the destruction of the life of an old and infirm person, because it is manifest, and must have been obvious to the framers of the Constitution that such person could not earn more money than was necessary to support them. If the framers of the Constitution had intended that the net earnings of the decedent should be the criterion of recovery, it seems clear to me that they would have so expressed it, but the expression used is "damages," and to my mind that can only mean such damages as the party to be affected thereby

sustained. In the case of husband or wife the damages include not only the power to earn money, but damages incident to the deprivation of the society of the life-partner, as well as the satisfaction of having some one vitally interested in the welfare of the family to look after and care for its interest.

I know of no case where the party suing for personal injuries was restricted in the right of recovery to only such net sum of money as they could earn over and above their expenses. Not only so, but such persons have been allowed to recover for mental and physical suffering, as well as the necessary expenses incident to medical treatment. Indeed, I am not aware of any case in which the damages for wrongs inflicted are restricted as is proposed in the majority opinion in this case. So far as I am advised no such doctrine was ever announced by this court prior to the Lang case, nor by any circuit court of this State.

For the reasons indicated, and for many other reasons not now deemed necessary to state, I feel it my duty to file this dissenting opinion.

JUDGE GUFFY DELIVERED THE FOLLOWING ADDITIONAL DISSENTING OPINION, NOVEMBER 16, 1898:

Since the filing of my dissenting opinion of June 15, 1898, a petition for rehearing has been considered and overruled by the court. The majority opinion has, however, been modified by striking therefrom the following: "This entirely leaves out of view the fact that deceased necessarily applied a certain portion of the money earned by him to his own support." This modification of

the opinion, however, leaves the majority opinion open to the construction that damage to the estate of the decedent is all that can be recovered. In other words that no recovery can be had, beyond the number of dollars that the decedent would earn over and above his necessary expenses of living, and entirely leaves out of view any damages resulting to any person for the loss of the society, or personal care or attention of the deceased. Such a construction is not, as I think, authorized by the language used in the Constitution, nor supported by reason, nor humanity. There can be no damage to the estate except in dollars, for the only meaning that can properly be attached to estate is money or property.

Section 241 of the Constitution reads as follows: "Whenever the death of a person shall result from an injury inflicted by negligence or wrongful act, then, in every such case, damages may be recovered for such death, from the corporations and persons so causing the same. Until otherwise provided by law, the action to recover such damages shall in all cases be prosecuted by the personal representative of the deceased person. The General Assembly shall provide how the recovery shall go and to whom belong; and until such provision is made the same shall form part of the personal estate of the deceased person."

It will be seen from the foregoing provision that the Constitution uses the term "in every such case, damages may be recovered for such death." But if it be true that only the damage to the estate can be recovered then it follows that in many cases no damages can be recovered, because the injured party would be incapable of adding anything

to his estate; while in many other cases he or she could add nothing in excess of what was necessary for his or her support, and thus the decision of the court would in effect destroy a plain provision of the Constitution. It will be further seen from the provision of the Constitution that it was not intended by the framers of the Constitution that the damages should constitute necessarily any part of the estate of the decedent, because it is provided that the General Assembly may provide how the recovery shall go, and to whom belong, with the further provision that until such provision is made that the damages shall form part of the estate of the deceased person, the latter provision evidently being inserted to prevent confusion until the legislature acted. It seems clear to me that the rule announced in the majority opinion is in conflict with the plain meaning of the Constitution, and also inequitable; because in many instances the survivor would not be seriously injured except on account of the loss of the society of the decedent, but would nevertheless be entitled to have a large judgment. For instance, a judge of the Supreme Court of the United States earns at least $10,000 a year for life, and $2,000 for personal expenses, I take it, would be a very liberal allowance, and if his expectation of life was fifteen years the damage to his estate by the destruction of his life could not be less than $120,000; while another man might not be able to earn more than one dollar per day, and more then one-half of that would be required for his support, and his expectation of life might be the same while the recovery for his death could not exceed $2,500, and yet as a matter of fact his death would entail more

want and suffering upon those depending upon him than those in the former case. Again, many railroad presidents, and presidents of other large establishments receive $25-000 per year, and it is liberal to allow $2,000 per year for their personal expenses, and applying the same rule of damages the recovery for the death of such a one would be $345,000. It is perfectly clear that the estate would be damaged to that extent, unless we should assume that he would not be able all his life to earn such a salary. Similar results would attend the recovery in the case of death of great number of officers who hold during life. It seems to me that the framers of the constitution never intended any such results. The parties most interested in the life of another are the wife, husband, parent and child, and evidently the framers of the constitution intended that they should be entitled to recover such damages as they sustained, and as before indicated the loss of society and personal protection is the chief element of damage. Can it be that the framers of the constitution intended that the husband or wife, although incapable of earning a dollar per month, might be killed by the negligence of some person, and the survivor be unable to recover any damages? I think not.

It seems clear to me that the legislature, which met soon after the adoption of the constitution, understood the constitutional provision as I now understand it. Section 6 of the Kentucky Statutes provided for the enforcement of the constitutional provisions, and thereby discharged the duty imposed upon it. Said section reads as follows: "Whenever the death of a person shall

Louisville & Nashville R. R. Co. v. Eakin's Adm'r.

result from an injury inflicted by negligence or wrongful act, then in every such case, damages may be recovered for such death from the person or persons, company or companies, corporation or corporations, their agents or servants, causing the same, and when the act is willful or the negligence is gross, punitive damages may be recovered, and the action to recover such damages shall be prosecuted by the personal representative of the deceased. The amount recovered, less funeral expenses and the cost of administration, and such costs about the recovery, including attorney fees as are not included in the recovery from the defendant, shall be for the benefit of and go to the kindred of the deceased in the following order, viz: 1. If the deceased leaves a widow or husband, and no children or their descendants, then the whole to such widow or husband. 2. If the deceased leaves either a widow and children or husband and children, then one-half to such widow or husband and the other one-half to the children of the deceased. 3. If the deceased leaves a child or children, but no widow or husband, then the whole to such child or children. If the deceased leaves no widow, husband or child, then such recovery shall pass to the mother and father of deceased, one moiety each, if both be living; if the mother be dead and the father be living, the whole thereof shall pass to the father; and if the father be dead, and the mother living, the whole thereof shall go the mother; and if both father and mother be dead, then the whole of the recovery shall beome a part of the personal estate of the deceased; and after the payment of his debts, the remainder, if any, shall pass to his kindred more re-

mote than those above named, as is directed by the general law on descent and distribution."

It will be seen from the section supra that after the payment of funeral expenses and the cost of administration, and such costs about the recovery, including attorney fees as are not included in the recovery from the defendant, the amount recovered shall go first to the widow or husband in the event that the deceased left no children, or descendants; but if the deceased leaves a widow and children, or husband and children then one-half to such widow or husband, and the other to the children of the deceased. Further provisions is made in the event of the deceased leaving neither descendant, widow or husband that the recovery shall pass to the mother and father, and in the event that the deceased leaves none of the relatives mentioned it is further provided that the recovery shall become a part of the personal estate of the deceased; and after the payment of his debts, the remainder, if any, shall pass to his kindred under the general law of descent and distribution.

Thus it will be seen that the legislature utterly failed to recognize or treat the damages as a part of the personal estate of the decedent in the common acceptation of the term. It is further provided in the section supra that when the act is willful or the negligence gross punitive damages may be recovered. If the true meaning of the constitution is that the damage to the estate of the decedent is all that can be recovered then it must follow that no punitive damages can in any case be recovered, for it is impossible for the willfulness or grossness of the act to

increase the damage to the estate.   When a party is dead his capacity to earn money is effectually and entirely destroyed, and the damage to his estate can neither be increased or decreased by the character of the act causing his death.   The mental anguish to the widow, husband, parent and children may be increased because of the grossness or willfulness of the act, and indeed such would always be the case, but the character of the act can in no wise affect the estate.

The court below in the case at bar authorized the jury to find for the plaintiff the damages sustained by the widow and children, not exceeding the amount sued for, which instruction is condemned by the majority opinion. It is suggested that they are not parties to the suit, but we have seen from the statute heretofore quoted that they were the chief beneficiaries, or in other words entitled to most of the recovery, and in my opinion the prime object of the provision in the constitution was for the benefit of the surviving widow, husband, parent and children.   Some quotations from decisions of other states. are embodied in the majority opinion in support of the opinion.   It does not appear whether or not the decisions referred to were rendered under such provisions as we find in our organic and statutory law; I therefore assume that such was not the case, but if my assumption is wrong I still have no hesitancy in holding that such opinions are radically wrong.

I think it was the intention of the framers of the constitution that all damages that a survivor sustained by the loss of life as specified in the constitution should be recov-

ered, and that it was the intention that the loss of society, care and protection reasonably given and expected to be given by the decedent should be considered in estimating the damages, and therefore the plaintiff in such case should be allowed to prove whether the decedent left a companion, or children or parents, and that the damages suffered by such bereft relative should be recoverable. Such a rule would be fair, reasonable, and humane. Where there are no such relatives as those mentioned in the statute a money consideration, or in other words the damages to the estate would be the just and proper criterion, for as a rule a creditor or distant relative would sustain no damage except to the extent that the death of the party lessens the amount of money which he would leave for distribution.

It is difficult to understand how the estate of decedent is to be compensated for damages caused by the destruction of decedent's power to earn money. Estate is property. If the decedent owned an estate at the time of his death the same remains. Estate is not a person capable of suing or being sued, nor can it be affected by sorrow or joy; hence I conclude that it cannot suffer damages nor be compensated. But I can understand how a husband or wife, parent or child may be damaged by the death of a relative or companion, and I can understand how some compensation might be made, and it seems to me that the constitution has provided that such injured party may be compensated for not only the power of decedent to earn money, but for the loss of the society of decedent, which is often more valuable and desirable than the money that

he could earn.   Take the case of a wife and children who have sufficient estate to enable them to supply every want or demand, the death of the head of the family would, so far as money is concerned, be little or no damage, although he was earning $10,000 per year, but the loss of the society and protecting care of the decedent would be very great damage to the wife and children, and for such damage it seems to me they are entitled to recover.   On the other hand, I can imagine the case of an old and infirm couple who have accumulated enough to live upon, but who are now unable to earn a dollar.   It is possible, if not probable, that the wife may lose her life by the negligence or wrongful act of some one, and yet as she has no capacity to earn money no recovery could be had under the doctrine of the majority opinion, as I understand it; yet it can not be denied that the damage to the bereaved husband would be very great. It appears clear to me that the constitution says that the husband is entitled to damages for the loss of his companion, and that enjoyment of her company is one of the elements of damages for which a recovery is allowed.   The law is not harsh—if the killing be not the result of negligence or wrongful act no recovery can be had.   If it be the result of negligence or wrongful act, the wrong doer should make reparation in all cases.

If no recovery can be had except for the destruction of the power of the decedent to earn money less the necessary cost of living then there can be but little recovery in the great majority of cases, and in many cases there can be

no recovery at all, while in few cases the recovery must be immense.

Section 54 of the constitution provides that: "The General Assembly shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property."

It appears to me that the majority opinion limits the recovery provided for by excluding one of the elements of damage, viz: loss of company, society and association, which to my mind is usually the chief damage sustained by the party damaged.

The importance of the questions involved is my only, apology for this earnest but respectful dissent.